*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 69**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

PLEASANT GROVE CITY,
*Appellee,*

*v.*

KEITH TERRY,
*Appellant.*

No. 20160092
Heard October 11, 2018
Filed October 29, 2020

On Certification from the Utah Court of Appeals

Fourth District, Provo
The Honorable Thomas Low
Case No. 141101126

Attorneys:

Christine M. Petersen, Summer D. Shelton, Michael J. Scott, Pleasant Grove, for appellee

Richard A. Roberts, Sean M. Petersen, Jacob S. Gunter, Provo, for appellant

JUSTICE HIMONAS authored the opinion of the Court in which CHIEF JUSTICE DURRANT and JUSTICE PEARCE joined.

JUSTICE PETERSEN authored a dissenting opinion in which ASSOCIATE CHIEF JUSTICE LEE joined.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶1 Our deference to the jury's decision-making does not extend to verdicts that are legally impossible. This case presents such a situation. Keith Terry's conviction on the offense of domestic violence

in the presence of a child—a legal impossibility given his acquittal on the offense predicating it, domestic violence assault—is anathema to the laws of an enlightened, civilized society. We accordingly use our constitutionally granted supervisory authority to invalidate legally impossible verdicts, such as the one the jury reached here, and vacate Terry's conviction.

## BACKGROUND

¶2  Terry was picking up his children from school one afternoon in his Jeep. After his son got in the passenger seat, and while he waited for his daughter, Terry's ex-wife confronted him and argued that it was not his turn to pick up the children. The two quarreled, and at some point, Terry's ex-wife approached the passenger side of the Jeep. She claimed it was to hug her son through the Jeep's open window and calm him down because the child had been upset by the couple's fighting. Then, according to her, Terry punched her in the mouth. Terry, on the other hand, claimed that his ex-wife opened the passenger-side door, and all he did was put his arms around his son to keep him in the Jeep. Terry denied ever striking his ex-wife and said that it was she who started hitting him on his hands and arms.

¶3  Following this altercation, Terry's ex-wife began to shout repeatedly, "He hit me!" and backed away from the vehicle. At that point, Terry saw an unknown man running toward him, so he started driving. The man, whom Terry later discovered to be his ex-wife's boyfriend, chased Terry's Jeep and eventually jumped into it through the open passenger-side window. Terry drove several blocks erratically in an attempt to shake the man off the vehicle. Unsuccessful, Terry called the police and drove the vehicle to a nearby police station, all while the man was hanging halfway out the passenger-side window.

¶4  Relevant here, Pleasant Grove City charged Terry with one count of domestic violence assault and one count of commission of domestic violence in the presence of a child. After trial, the jury initially deadlocked, but reached a verdict after the judge had them further deliberate. The jury convicted Terry on the offense of commission of domestic violence in the presence of a child, but

acquitted him of the offense that predicated the conviction, domestic violence assault.[1]

¶5   The trial judge was baffled by this outcome. He explained to the parties that although he had never had to deal with such a situation, he believed that "if [the jury] had reasonable doubt as to [domestic violence assault, the predicate offense], then there [had] to be reasonable doubt as to [domestic violence in the presence of a child, the compound offense]." After further research (during a short recess), however, the trial judge was "surprised" to find that there was no case supporting his intuition and accordingly did not intervene in the verdict. Following the trial court's conclusion and before sentencing, Terry filed a motion to arrest judgment and to strike the inconsistent jury verdict, which had acquitted him on the predicate offense of domestic violence assault, but convicted him of the compound offense of domestic violence in the presence of a child. The trial court denied the motion and sentenced Terry.

¶6   Terry timely appealed the judgment and the trial court's order denying his motion. The court of appeals certified the case to this court, explaining that it "presents an important first impression question in the context of predicate and compound offenses." We exercise jurisdiction under Utah Code section 78A-3-102(3)(b).

## STANDARD OF REVIEW

¶7   This is the first time we have ever addressed the appropriate standard of review for a legally impossible verdict. We hold that this is a question of law, which we review for correctness. *State v. Newton*, 2020 UT 24, ¶ 16, 466 P.3d 135.

¶8   This court has never set out the standard of review for legally impossible verdicts. We have, however, articulated a standard of review for "inconsistent verdicts." *State v. Stewart*, 729 P.2d 610, 613 (Utah 1986) (per curiam) (holding that appellate courts review inconsistent verdicts only for "insufficient evidence to support the guilty verdict"). But "the term 'inconsistent verdicts' is often used in an imprecise manner and may include a wide variety of related, but nonetheless distinct, problems." *State v. Halstead*, 791 N.W.2d 805, 807

---

[1] The City also charged Terry with one count of reckless endangerment and one count of reckless driving. The jury convicted Terry of these charges, and Terry has not appealed these convictions.

(Iowa 2010); *see also State v. Stewart* (*Md. Stewart*), 211 A.3d 371, 375 n.1 (Md. 2019) (McDonald, J., concurring) (identifying several "categories of inconsistent verdicts"). Indeed, the term "inconsistent verdicts" encompasses at least two different types of verdicts: factually inconsistent verdicts and legally impossible verdicts (sometimes known as legally inconsistent verdicts). *Stewart* dealt with factually inconsistent verdicts and does not control the question of the standard of review here because here we have a legally impossible verdict.[2] And legally impossible verdicts should be treated differently than factually inconsistent verdicts for two reasons.

¶9 First, with factually inconsistent verdicts, because the question is centered on the evaluation of evidence, it may make sense not to overturn a jury's verdict "unless reasonable minds could not rationally have arrived at a verdict of guilty beyond a reasonable doubt based on the law and on the evidence presented." *State v. Gibson*, 2016 UT App 15, ¶ 16, 366 P.3d 876 (citation omitted). *Stewart* presents a classic example. There, multiple defendants were tried together for a stabbing death; some were acquitted, and some, including Stewart, were convicted. 729 P.2d at 611. As we explain in more detail below, *see infra* ¶¶ 39–40, we held that there was an evidentiary basis to conclude "that the jury believed those portions of the evidence . . . unfavorable to [Stewart] and the evidence favorable to [the] other defendants." *Id.* at 614. Indeed, "testimony showed that Stewart carried the only knife capable of causing the fatal stab wound." *Id.* at 612. But with legally impossible verdicts in which a defendant is acquitted on the predicate offense but convicted on the compound offense, this calculation is self-solving: reasonable minds cannot rationally arrive at a guilty verdict for a compound offense when the acquittal on the predicate offense negates a necessary element of such conviction. And unlike with factually inconsistent

---

[2] The dissent agrees that "our decision in *Stewart* does not control" but argues that it merely "present[s] us with different considerations" than the present case. *Infra* ¶ 65. Below we explain in some length why the difference between factually inconsistent verdicts like in *Stewart* and legally impossible verdicts like in Terry's case are more than just "different considerations." *See infra* ¶¶ 36–37, 42–46. For those reasons, and the reasons we elaborate on below here, *infra* ¶¶ 9–11, there are no relevant similarities in our standard of review of these verdicts.

verdicts, a "reviewing court, distanced from a jury, is equipped to evaluate independently the legal elements of charged crimes and make a determination as to whether the verdicts are compatible with these elements." *McNeal v. State*, 44 A.3d 982, 993 (Md. 2012).

¶10 Second, one of the reasons we review factually inconsistent verdicts only for sufficiency of evidence is that the defendant "receives 'the benefit of . . . acquittal on the counts on which [the defendant] was acquitted' and 'accept[s] the burden of conviction on the count[] on which the jury convicted.'" *United States v. Petit Frere*, 334 F. App'x 231, 238 (11th Cir. 2009) (third and fourth alterations in original) (quoting *United States v. Powell*, 469 U.S. 57, 69 (1984)). This premise makes no sense when it comes to legally impossible verdicts in which a defendant is acquitted on the predicate offense but convicted on the compound offense. It would require an appellate court to pretend that the same jury, looking at the same evidence, acquitted the defendant of the predicate offense standing alone, but simultaneously found the defendant guilty of the predicate offense as part of the compound offense—essentially asking an appellate court to conclude that "the same . . . element or elements of each crime were found both to exist and not to exist." *Price v. State*, 949 A.2d 619, 636 (Md. 2008) (Harrell, J., concurring); *see also McNeal*, 44 A.3d at 984 (adopting Justice Harrell's concurrence in *Price*). We do not engage in such theatrics.

¶11 For these reasons, we do not apply *Stewart*'s sufficiency-of-the-evidence standard to legally impossible verdicts in which a defendant is acquitted on the predicate offense but convicted on the compound offense. Unlike with factually inconsistent verdicts, these legally impossible verdicts involve a question of law—"the consequence of a jury verdict that convicts the defendant of a compound [offense] yet acquits the defendant on the only predicate [offense] in the case as instructed by the court." *Halstead*, 791 N.W.2d at 807 (footnote omitted); *see also Brown v. State*, 959 So. 2d 218, 220 (Fla. 2007) ("An inconsistent verdicts claim presents a pure question of law"); *Givens v. State*, 144 A.3d 717, 725 (Md. 2016) ("An appellate court reviews without deference a trial court's ruling on a motion to strike a guilty verdict that is allegedly inconsistent with a not-guilty verdict," because it presents "a question of law." (citation omitted)). We review questions of law for correctness. *See Newton*, 2020 UT 24, ¶ 16.

## ANALYSIS

¶12 Terry argues that his acquittal of the domestic-violence-assault offense precludes his conviction of the offense of domestic

violence in the presence of a child. We agree. His acquittal on one count makes his conviction on the other legally impossible. Both outcomes turn on the same offense—domestic violence assault—and the jury's different answers are irreconcilable as a matter of law. In Part I, we confront the issue of legally impossible verdicts and determine that they cannot stand. Then, in Part II, using our constitutionally granted supervisory authority, we formulate a rule requiring vacatur of legally impossible verdicts like Terry's.

## I. THE PROBLEM OF LEGALLY IMPOSSIBLE VERDICTS

¶13  Legally impossible verdicts are verdicts that are inconsistent "as a matter of law because it is impossible" to reconcile the different determinations that the jury would have had make to render them. *State v. Halstead*, 791 N.W.2d 805, 807 (Iowa 2010). We begin with explaining why the jury verdict here is legally impossible. Then we show that legally impossible verdicts like Terry's cannot stand as a matter of law because they are "not merely inconsistent with justice, but [are] repugnant to it." *People v. Tucker*, 431 N.E.2d 617, 619 (N.Y. 1981). Next, we tackle the contrary position—which holds that legally impossible verdicts are valid—and explain why we are not swayed by it. Finally, we explain why our case law about factually inconsistent verdicts does not control legally impossible verdicts.

### *A. Terry's Verdict Is Legally Impossible*

¶14  The City charged Terry with the offense of domestic violence assault, UTAH CODE § 76-5-102(1)(c) (2003),[3] and the offense of commission of domestic violence in the presence of a child, UTAH CODE § 76-5-109.1(2)(c). These two offenses are related because the latter offense is predicated on the commission of the former. Defining the latter offense, Utah Code section 76-5-109.1(1)(b) states that "'[d]omestic violence' has the same meaning as in Section 77-36-1." Utah Code section 77-36-1(4), in turn, defines "[d]omestic violence" to "include commission" of "assault, as described in Section 76-5-102," "when committed by one cohabitant against another." Thus, the offense of commission of domestic violence in the presence of a child is a compound offense that is predicated on the commission of domestic violence assault. A "compound offense" is an "offense composed of one or more separate offenses. For example, robbery is a compound offense composed of larceny and assault." *Compound*

---

[3] The statute was amended in 2015, after Terry's charging, and section (1)(c) became (1)(b).

*Offense*, BLACK'S LAW DICTIONARY (11th ed. 2019). And a "predicate offense," also known as a "lesser included offense," is a "crime that is composed of some, but not all, of the elements of a more serious crime and that is necessarily committed in carrying out the greater crime." *Lesser Included Offense*, BLACK'S LAW DICTIONARY (11th ed. 2019); *Id.*, *Predicate Offense*.[4]

¶15 "[I]t is impossible to convict a defendant of the compound [offense] without also convicting the defendant of the predicate offense." *Halstead*, 791 N.W.2d at 807 (footnote omitted); *see also Md. Stewart*, 211 A.3d 371, 384 (Md. 2019) (Opinion by Watts, J. (commanding majority for its analysis)) ("[A] guilty verdict and a not-guilty verdict are legally inconsistent where the crime of which the jury finds the defendant not guilty is a lesser-included offense of the crime of which the jury finds the defendant guilty."). Yet the jury in Terry's case did the impossible. It convicted Terry of the compound offense (domestic violence in the presence of a child), while acquitting him of the predicate offense (domestic violence assault).

¶16 Legally impossible verdicts are verdicts that include an inconsistency "as a matter of law because it is impossible" to reconcile different determinations that the jury made in them. *Halstead*, 791 N.W.2d at 807. And here, it is impossible to reconcile a conviction with an acquittal on "essential elements . . . identical and necessary" to sustain the conviction. *State v. Arroyo*, 844 A.2d 163, 171 (R.I. 2004) (citation omitted); *see also Shavers v. State*, 86 So. 3d 1218,

---

[4] This case involves an exception to the general rule that a "defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense." UTAH CODE § 76-1-402(3). This rule does not apply "where the Legislature has designated a statute as an enhancing statute," *State v. Bond*, 2015 UT 88, ¶ 70, 361 P.3d 104, which "single[s] out particular characteristics of criminal conduct as warranting harsher punishment," *State v. Smith*, 2005 UT 57, ¶ 10, 122 P.3d 615. Such designation requires an "explicit indication of legislative intent." *Id.* ¶ 11. Utah Code section 76-5-109.1(4) includes such indication: "A charge under this section is separate and distinct from, and is in addition to, a charge of domestic violence where the victim is the cohabitant. Either or both charges may be filed by the prosecutor." Thus, charges (and convictions) on both predicate and compound offenses are permissible in this case.

1221 (Fla. Dist. Ct. App. 2012) ("[L]egally [impossible] verdicts . . . arise when a not-guilty finding on one count negates an element on another count that is necessary for conviction."); *Price v. State*, 949 A.2d 619, 634 (Md. 2008) (Harrell, J., concurring in the judgment) ("A legal inconsistency . . . occurs when 'an acquittal on one charge is conclusive as to an element . . . [of] a charge on which a conviction has occurred.'" (citation omitted)) (adopted in *McNeal v. State*, 44 A.3d 982, 984 (Md. 2012)).

¶17 At oral argument, the City conceded the relationship between the offenses in this case and acknowledged the illogic embedded in Terry's verdict. Yet it still maintains that Terry's verdict is not legally impossible, for two reasons. First, in the City's view, there can be no legal impossibility when there is sufficient evidence, as Terry concedes is the case here. Second, according to the City and the dissent, because we evaluate every count separately, the contradicting results the jury reached are not legally impossible. *See infra* ¶¶ 57, 66, 69, 74. Both arguments do not persuade us.

¶18 First, the argument that there was sufficient evidence to support a guilty verdict on the compound offense is of no moment to our holding that the verdict is legally impossible. Given that both the compound offense and the predicate offense were based on the same evidence and the same event, the jury also had sufficient evidence to support a guilty verdict on the predicate offense. Yet they did not do so. And that acquittal was fatal to the jury's ability to convict on the compound offense, because "an acquittal of [a predicate offense] effectively holds the defendant innocent of a [compound] offense involving that same [predicate offense]," *Naumowicz v. State*, 562 So. 2d 710, 713 (Fla. Dist. Ct. App. 1990), and "negates a necessary element for conviction on" the compound offense, *State v. Kelley*, 109 So. 3d 316, 317 (Fla. Dist. Ct. App. 2013) (citation omitted).

¶19 Second, the argument that verdicts like Terry's are not legally impossible because we review claims that the State has not met its burden of proof on a particular count of conviction, on each count independently, *see infra* ¶¶ 57, 66, 69, 74; *see also State v. Stewart*, 729 P.2d 610, 613 (Utah 1986) (per curiam), is likewise unavailing. We do not deny that this our general rule, but it is not an inexorable mandate. If it yields absurd results—or in this case, legally impossible results—we should not blindly follow it.[5] *See, e.g., A.K. &*

---

[5] The dissent seems to be focused on this argument as the ultimate reason for us to affirm a legally impossible judgment, *see infra* ¶¶ 57,

(continued . . .)

*R. Whipple Plumb. & Heat. v. Guy*, 2004 UT 47, ¶ 11, 94 P.3d 270 (describing with approval how our Court of Appeals refused to strictly apply our "net judgment rule" because it led to "absurd results"); *State v. Springer*, 121 P. 976, 979 (Utah 1911) (refusing to submit a plea of former acquittal "to the jury to be passed on by it as a question of fact" although past case law suggested "courts have no alternative," because it would "lead to an absurd result."). If the State chose to intertwine the offenses, it cannot then disentangle them at-will when it's convenient. Here, the City repeatedly discussed the predicate and compound offenses together and explicitly relied on the same evidence for the two offenses. Similarly, the jury instructions also linked the two offenses—explaining that the basis for the compound-offense charge was that Terry allegedly "committed an act of domestic violence in the presence of a child" by committing the predicate offense (assault) "while the nine year old child was less than three feet away." The City cannot have its cake and eat it too. Its prosecutorial choices show that the jury was presented with the compound offense *predicated* on the occurrence of the predicate offense. We cannot and should not review them separately in such circumstances. *See, e.g.*, *Streeter v. State*, 416 So. 2d 1203, 1206 n.3 (Fla. Dist. Ct. App. 1982) (noting an "exception to the proposition that separate counts must be viewed independently" when "what the jury *fails to find* in one count vitiates a guilty verdict on a separate count to the benefit of the defendant"). The dissent calls our approach "novel," *infra* ¶ 57, but this approach is practiced in every jurisdiction that refuses to accept legally impossible verdicts, *see supra* ¶¶ 15–16.

¶20 Thus, the verdict here—convicting Terry of a compound offense while acquitting him of the predicate offense—is legally impossible.

### B. Legally Impossible Verdicts Like Terry's Are Anathema to Our Justice System

¶21 Having established that Terry's jury rendered a legally impossible verdict, we now explain why the verdict cannot stand. Two reasons lead us to this conclusion. First, a legally impossible verdict in which a defendant is acquitted on the predicate offense but

---

66, 69, 74, but other than repeat our commitment to this rule, it does little to address the concerns we raise against a blind reliance in this case.

convicted on the compound offense doesn't just undermine our confidence in the trial's outcome, it eviscerates it. Second, upholding such legally impossible verdicts casts a cold shadow on the criminal justice system, and this shadow is far more worrisome than the inability to retry the defendant due to constitutional constrains. We then reject the argument that invalidating legally impossible verdicts of this kind somehow disrupts the jury verdict's finality or invades the jury process.

¶22 Legally impossible verdicts—in which a defendant is acquitted on the predicate offense but convicted on the compound offense—cannot stand for two reasons. First, they undermine "our confidence in the outcome of the trial," *Halstead*, 791 N.W.2d at 815, because for a defendant to "be convicted for a crime on which the jury has actually found that the defendant did not commit an essential element, whether it be one element or all[,] . . . is not merely inconsistent with justice, but is repugnant to it," *Tucker*, 431 N.E.2d at 619. The legally impossible verdict means that the jury necessarily overstepped its "historic role" as "fact-finder," *McNeal*, 44 A.3d at 986, and has "taken the law into its own hands," *Md. Stewart*, 211 A.3d at 376 (Opinion by McDonald, J.), by presumably "engag[ing] in some . . . process that is inconsistent with the notion of guilt beyond a reasonable doubt," *Halstead*, 791 N.W.2d at 815. The requirement that guilt must be proven beyond a reasonable doubt is part and parcel of constitutional due process. *State v. Maestas*, 2012 UT 46, ¶ 167, 299 P.3d 892 ("In the criminal justice system, a defendant is presumed innocent and the prosecution must prove guilt beyond a reasonable doubt."); *State v. Swenson*, 838 P.2d 1136, 1138 (Utah 1992) ("Both the United States Constitution and the Utah Constitution require that the burden of proving all elements of a crime is on the prosecution." (citing *In re Winship*, 397 U.S. 358, 364 (1970)). Such a constitutional insult cannot stand.

¶23 Second, we are deeply concerned about the perceptions of a criminal justice system that upholds such legally impossible verdicts.

> When liberty is at stake, we do not think a shrug of the judicial shoulders is a sufficient response to an irrational conclusion. We are not playing legal horseshoes where close enough is sufficient. It is difficult to understand why we have a detailed trial procedure, where the forum is elaborate and carefully regulated, and then simply give up when the jury confounds us.

*Halstead*, 791 N.W.2d at 815. "[T]he possibility of a wrongful conviction in such cases outweighs the rationale for allowing verdicts to stand." *State v. Powell*, 674 So. 2d 731, 733 (Fla. 1996). Terry's case may only present misdemeanors, but affirming such a legally impossible verdict extends beyond it, and applies equally to grave offenses, such as felony murder. *See, e.g.*, *Mahaun v. State*, 377 So. 2d 1158, 1161 (Fla. 1979). If we affirm the ability of a jury to render such a legally impossible verdict, we sanction the lengthy (perhaps lifelong) incarceration of a defendant for a murder although the jury acquitted him from the underlying felony that allowed the felony murder charge. We cannot stand by legally impossible verdicts and call our system a justice system.[6]

¶24 We acknowledge the implications of our decision on the future prosecution of defendants who receive legally impossible verdicts in which the defendant is acquitted on the predicate offense but convicted on the compound offense. "The double jeopardy provisions in both the United States and Utah Constitutions generally prohibit the State from making repeated attempts to convict an individual for the same offense after jeopardy has attached, which in jury trials occurs after a jury has been selected and sworn." *State v. Harris*, 2004 UT 103, ¶ 22, 104 P.3d 1250 (footnotes omitted). And so, with legally impossible verdicts like the one here, the double jeopardy provisions may effectively preclude a retrial of the acquittal on the predicate offense. The same might be true for retrying the compound offense, the argument being that a defendant with a legally impossible verdict cannot be retried on the compound offense if "there was insufficient evidence to support [that] conviction[]."

---

[6] The dissent says that "neither the United States Constitution, [nor] the Utah Constitution, . . . have been read to require" the invalidation of legally impossible verdicts. *See infra* ¶ 59. As for the U.S. Constitution, it is true that the U.S. Supreme Court remarked in *United States v. Powell*, 469 U.S. 57, 65 (1984) that "nothing in the Constitution would require such a protection," but no such statement was conclusively made as to the Utah Constitution. We also stress that the decision of the U.S. Supreme Court to adjudicate the issue "under [its] supervisory powers over the federal criminal process," *id.*, allows for independent treatment by state courts, also in accordance to their constitutions, where appropriate. Therefore, as for the Utah Constitution, the fact that no such reading has been offered in the past should not signal that it is not possible.

*Bravo-Fernandez v. United States*, 137 S. Ct. 352, 364 (2016). Under this assumption, it seems that the prosecution would be estopped from a retrial on the compound offense.[7]

¶25 But the inability to retry a defendant is far preferable to defendants being convicted of and punished for crimes that—according to the jury's acquittal on the predicate offense—they never could have committed. After all, Blackstone's ratio—the basis for our presumption of innocence and the core principle of our criminal justice system—tells us that "[i]t is better that ten guilty persons escape than one innocent suffer." 4 WILLIAM BLACKSTONE, COMMENTARIES *352; *see also State v. Reyes*, 2005 UT 33, ¶ 11, 116 P.3d 305 ("Blackstone set an enduring benchmark for the measure of certainty required to convict in a civilized society . . . ."). If we succumb to the opposite rationale, we would be "presum[ing] unlawful acquittal" "rather than guard[ing] against unlawful conviction."[8] Albert W. Alschuler, *The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts*, 56 U. CHI. L. REV. 153, 213 (1989).

¶26 For these reasons, we hold that legally impossible verdicts—in which a defendant is acquitted on the predicate offense but convicted on the compound offense—cannot stand. In doing so, we do not ignore our usual deep reluctance to disturb the finality of a jury verdict, as the dissent suggests, or inquire into the jury's intent. *See infra* ¶ 71. These principles are simply not at play here. We confront other legal errors made at trial, and legally impossible verdicts should not fare differently. And legally impossible verdicts do not require inquiry into the jury's intent.

---

[7] We note that the City has not indicated that it intends to prosecute Terry again, and the parties have not briefed this issue. Recognizing that it is a question of first impression, we leave the ultimate disposition of this question for an appropriate future case.

[8] The dissent claims "that is not so." *Infra* ¶ 69. In its view, our approach leads courts to "discard[]" jury verdicts that determined "guilt beyond a reasonable doubt." *Infra* ¶ 69. This claim crystalizes our different approaches to this question. To us, no such verdict has been discarded, because there is no logical way for a jury to acquit a person on a predicate offense and then finding them guilty on the compound offense beyond a reasonable doubt.

¶27 We routinely overturn trial courts' decisions for legal errors. We should do the same when a jury makes a legal error. In fact, we must, because adjudicating matters of law is our duty as an appellate court. We review questions of law for correctness, and even under one of our more deferential standards of review—abuse of discretion—we have long held that a "legal error is an abuse of discretion that undercuts the deference we would otherwise afford" a trial court. *Rocky Ford Irrigation Co. v. Kents Lake Reservoir Co.*, 2020 UT 47, ¶ 78, 469 P.3d 1003. In fact, other courts have refused to accept legally inconsistent verdicts rendered by a judge. *See United States v. Maybury*, 274 F.2d 899, 903 (2d Cir. 1960); *State v. Williams*, 916 A.2d 294, 305 (Md. 2007); *Akers v. Commonwealth*, 525 S.E.2d 13, 17 (Va. Ct. App. 2000). We see no reason why a legal error made by one fact finder—a jury—should be treated differently than one made by another—a judge. Any reluctance we might have to disturb the jury's verdict is a byproduct of judicial restraint—not an inexorable mandate. For example, we overturn a jury verdict—even a verdict that isn't impossible on its face—when the evidence, viewed in the light most favorable to the jury, "is sufficiently inconclusive or inherently improbable [so] that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645. (citation omitted). Importantly, our restraint is connected to the jury's "historical role" as "the sole fact-finder in criminal jury trials." *McNeal*, 44 A.3d at 986. But the jury does not act as a fact-finder when it misapplies the law—taking it "into its own hands," *Md. Stewart*, 211 A.3d at 376 (Opinion by McDonald, J.), and ignoring its "duty . . . to decide a criminal case according to established rules of law," *Price*, 949 A.2d at 627 (citation omitted)—as it does when it reaches a legally impossible verdict.[9]

---

[9] The dissent worries that we have created a "mandate[e] that such [legally impossible] jury verdicts be overturned" and suggests that our decision "weakens our longstanding and deep reluctance to disturb the finality of a jury verdict," *infra* ¶ 71, because "verdicts can be legally inconsistent in various ways and to different degrees." *Infra* ¶ 72. It cites from Justice Butler's dissenting opinion in *Dunn v. United States*, 284 U.S. 390, 399–407 (1932) (Butler, J., dissenting) for examples of varied types of inconsistent verdicts that Justice Butler saw as repugnant and therefore invalid. *See infra* ¶ 73.

The dissent worries in vain. We are not Justice Butler, and his view of repugnancy should not be confounded with ours. Our rule,

(continued . . .)

¶28 And in a case of a legally impossible verdict we have no need to inquire into the jury's intent. Quite the opposite. Discerning whether a verdict is legally impossible "does not require the court to engage in highly speculative inquiry into the nature of the jury deliberations." *Halstead*, 791 N.W.2d at 815. Instead, it "focuses solely on the legal impossibility of convicting a defendant of a compound crime while at the same time acquitting the defendant of predicate crimes." *Id.* The court must simply determine whether the conviction on the compound offense is possible in the face of an acquittal on a predicate offense. If it is not, then the verdict is legally impossible and should be overturned.

### C. The Opposite Approach Is Unpersuasive

¶29 But we are not an island. Other courts have addressed whether legally impossible verdicts—in which a defendant is acquitted on the predicate offense but convicted on the compound offense—are valid. We recognize that a majority of courts, led by the United States Supreme Court,[10] have gone the other way. *See, e.g.,*

---

as the dissent itself acknowledges, is "a narrow one." *infra* ¶ 72. It addresses one concrete type of legally impossible verdicts, which we repeatedly define with high specificity. *See supra* ¶¶ 9, 10, 11, 21, 22, 24, 26, *infra* ¶¶ 29, 32, 33, 35, 42, 48, 53, 54. We recognize that inconsistent verdicts (and within them legally impossible verdicts) come in many shapes and sizes. And we accordingly task our advisory committee with studying the matter in depth. *See infra* ¶ 55. Yet, as we explain below, "against the backdrop of a live controversy," *see infra* ¶ 52, we cannot let legally impossible verdicts, in which a defendant is acquitted on the predicate offense but convicted on the compound offense, stand.

[10] The U.S. Supreme Court implicitly decided *Dunn v. United States*, 284 U.S. 390 (1932) and explicitly decided *United States v. Powell*, 469 U.S. 57 (1984) merely on its "supervisory powers over the federal criminal process" and not on any constitutional basis. *Powell*, 469 U.S. at 65. Those decisions, therefore, have no direct application in this court, and we treat them merely as persuasive authority. *See* Eric L. Muller, *The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts*, 111 HARV. L. REV. 771, 774 (1998) ("Because the Court has seen no constitutional violation in inconsistent verdicts, state courts have been free to develop their own responses to inconsistent verdicts." (citation omitted)).

(continued . . .)

*United States v. Powell*, 469 U.S. 57 (1984); *Dunn v. United States*, 284 U.S. 390 (1932); *People v. Jones*, 797 N.E.2d 640, 645–48 (Ill. 2003); *Beattie v. State*, 924 N.E.2d 643, 649 (Ind. 2010). But "the persuasiveness of authority is not determined by the pound, but by the quality of the analysis."[11] *Halstead*, 791 N.W.2d at 811. And we find that the higher quality analysis in this arena resides with the minority of state courts; we join them today in holding that legally impossible verdicts in which a defendant is acquitted on the predicate offense but convicted on the compound offense are invalid. *See, e.g., id.; Brown v. State*, 959 So. 2d 218, 220–23 (Fla. 2007); *McNeal*, 44 A.3d at 984; *Commonwealth v. Gonzalez*, 892 N.E.2d 255, 262 n.8 (Mass. 2008).

¶30 In discussing the majority view, we begin and end with the U.S. Supreme Court case law because state courts holding the majority view, "generally break no new ground but restate the rule and reasoning" proffered in the Supreme Court's two relevant decisions—*Dunn* and *Powell*. *Halstead*, 791 N.W.2d at 810–11; *see also*

---

The dissent notes that the U.S. Supreme Court's rule "has now stood for eighty-eight years." *Infra* ¶ 61. But that does not change that it has no direct application in this court.

[11] We have departed from majority rules on other issues before without much fuss. *See, e.g., Nixon v. Clay*, 2019 UT 32, ¶ 22, 449 P.3d 11 (rejecting the majority rule for an exception to tort liability for injuries arising out of sports and adopting a different framework); *McArthur v. State Farm Mut. Auto. Ins. Co.*, 2012 UT 22, ¶¶ 11–12, 274 P.3d 981 (rejecting what seemed to be the majority approach regarding exhaustion clauses in insurance contracts because it was premised on common-law authority, and insurance law in Utah is governed by statute); *Murphy v. Crosland*, 915 P.2d 491, 493–94 (Utah 1996) (rejecting a majority rule regarding the interpretation of a rule of appellate procedure because it "relie[d] on an outdated advisory committee note"); *State v. Chapman*, 655 P.2d 1119, 1122–23 (Utah 1982) (rejecting the majority rule regarding the steps the State must undertake before it is allowed to present an out-of-state unavailable witness, because of its "inflexib[ility]"); *W. Land Equities, Inc. v. City of Logan*, 617 P.2d 388, 391 (Utah 1980) (rejecting the majority rule regarding retroactive application of zoning laws because it "fail[ed] to strike a proper balance between public and private interests and opens the area to so many variables as to result in unnecessary litigation").

Eric L. Muller, *The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts*, 111 HARV. L. REV. 771, 792 n.111 (1998) (noting that most state courts "rely on one or both of *Dunn* and *Powell* in affirming inconsistent verdicts").[12] In those two cases, the U.S. Supreme Court held that legally impossible verdicts are valid. *Powell*, 469 U.S. at 62; *Dunn*, 284 U.S. at 393. The specific facts of *Powell* and *Dunn* are immaterial to this discussion. It suffices to say that in both cases the defendants, like Terry, were acquitted of the predicate offense and convicted of the compound offense. Cumulatively, the Court's *Dunn* and *Powell* opinions present three reasons for upholding legally impossible verdicts.[13] They are all unpersuasive.

¶31  First, the Court held that legally impossible verdicts are "no more than [the jury's] assumption of a power which they had no right to exercise, but to which they were disposed through lenity." *Dunn*, 284 U.S. at 393 (citation omitted). The Court recognized that it was "equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [predicate] offense." *Powell*, 469 U.S. at 65; *see also Dunn*, 284 U.S. at 394 (holding that a legally impossible verdict "may have been the result of compromise, or of a mistake on the part of the jury"). But it held that all those possibilities merely emphasize that it is "unclear whose ox has been gored" when there has been a legally impossible verdict. *Powell*, 469 U.S. at 65.[14]

¶32  This rationale paves a one-way street: The Court will always construe a legally impossible verdict as an unworthy windfall for the

---

[12] We reviewed the cases referred to in Professor Muller's article that did not rely on *Dunn* or *Powell*, 111 HARV. L. REV. at 792 n.111, and uncovered no arguments that we have not otherwise addressed in this opinion.

[13] The *Dunn* Court also relied in part on a *res judicata* analysis, 284 U.S. at 393, which is no longer good law. But the Court later explained in *Powell* that "the *Dunn* rule rests on a sound rationale that is independent of its theories of res judicata, and [] it therefore survives an attack based upon its presently erroneous reliance on such theories." 469 U.S. at 64.

[14] We note that the dissent's position seems to rely primarily on this justification, *infra* ¶¶ 59–61, but does not offer any rebuttal to our rejection of it below, *infra* ¶ 32. *See also supra* ¶ 19 n.5.

defendant, and never as an injustice. Thus, by this rationale, the Court endorses a de facto "irrebuttable presumption that the jury . . . engage[s] in an act of lenity when it acquit[s] the defendant" of a predicate offense but convicts the defendant of the compound one. *Halstead*, 791 N.W.2d at 809. But "it is equally possible that [such a legally impossible] verdict is the product of animus toward the defendant rather than lenity."[15] *Id.* at 814. Certainly, "[t]he presumption of lenity seems particularly doubtful" in cases such as this one in which "the jury convicts a defendant of the more serious [compound] offense but acquits the defendant on [the] predicate [offense]." *Id.* If every legally impossible verdict were a result of lenity, then perhaps the approach adopted in *Dunn* and *Powell* would make sense. However, nothing in fact, law, or logic suggests that this story is accurate. We therefore reject the "lenity presumption" that *Dunn* and *Powell* adopted.

¶33 Second, and relatedly, the Court held that legally impossible verdicts "cannot be upset by speculation or inquiry into" why the jury rendered them, *Dunn*, 284 U.S. at 394, because, in its view, any such inquiry would be "imprudent" and "unworkable," *Powell*, 469 U.S. at 66. This reason carries no weight at all in our determination. As we explain above, once a jury has reached a legally impossible verdict, its reasons for doing so matter not. We do not peer into the jury's black box. Instead, much like we view an error of law as an automatic abuse of discretion, *see, e.g.*, *Rocky Ford*, 2020 UT 47, ¶ 78, so too we should view legally impossible verdicts—in which a defendant is acquitted on the predicate offense but convicted on the compound offense—as an automatically invalid legal error. Additionally, overturning legally impossible verdicts does not even require an inquiry into the jury deliberations, let alone speculation. *See Halstead*, 791 N.W.2d at 815 ("Making such legal determination does not require the court to engage in highly speculative inquiry into the nature of the jury deliberations."); *McNeal*, 44 A.3d at 992 (explaining that factually inconsistent verdicts require invasion to the "province of the jury" but that legally impossible verdicts do not). To the contrary—the analysis here "focuses solely on the legal

---

[15] The reader may wonder how an acquittal can mean animus. Jurors may think that a defendant is not guilty on all counts, but nevertheless find the defendant's behavior reprehensible for some reason and decide to "punish" them by convicting them of one of the offenses.

impossibility of convicting a defendant of a compound crime while at the same time acquitting the defendant of predicate crimes." *Halstead*, 791 N.W.2d at 815. The court must simply determine whether the conviction on the compound offense is possible in the face of an acquittal on a predicate offense. If it is not, then the verdict is legally impossible and should be overturned. Such an inquiry would not require us to peer into the jurors' minds even one bit.

¶34 Finally, in *Powell* the Court also concluded that the protection that a defendant receives provides sufficient "safeguards" against "jury irrationality or error" through "the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." 469 U.S. at 67. We disagree. Our main concern with legally impossible verdicts is that they are contradictory. An acquittal of the predicate offense clashes emphatically with the conviction of the compound offense. But a review for sufficiency of the evidence does not address that irrationality. It simply ignores it, instead asking us to rely only on the conviction. As we explain above, the mere fact that the evidence was sufficient for conviction on the compound offense does not somehow make the legally impossible verdict logical.

¶35 In conclusion, there is no good reason to let legally impossible verdicts, in which a defendant is acquitted on the predicate offense but convicted on the compound offense, stand. We, therefore, reject the majority view and hold that such legally impossible verdicts must be overturned.

*D. Our Case Law on Factually Inconsistent Verdicts Does Not Control*

¶36 Before turning to how we should go about invalidating legally impossible verdicts, we need to address Utah precedent about another member of the "inconsistent verdicts" family: factually inconsistent verdicts. That precedent does not concern this case because jury verdicts can be erroneous in different ways. Legal impossibility is just one of them, as we explain above. *See supra* ¶ 8. Much like different strains of the same virus, these various "inconsistent verdicts" present "distinct[] problems," *Halstead*, 791 N.W.2d at 807; *see also McNeal*, 44 A.3d at 993; *Gonzalez*, 892 N.E.2d at 262 n.8, that are more than just "different considerations," as the dissent suggests. *See infra* ¶ 65. And so, we are not talking about two strains of the common flu, but of the difference between the common flu and COVID-19. These two types of ills merit different treatment.

¶37 Traditionally, courts refer to legally impossible verdicts under the umbrella term of "inconsistent verdicts." *See, e.g., Powell*, 469 U.S. at 65. But the term "inconsistent verdicts" "include[s] a wide

variety of related, but nonetheless distinct, problems" in jury verdicts. *Halstead*, 791 N.W.2d at 807; *see also Md. Stewart*, 211 A.3d at 375 n.1 (Opinion by McDonald, J.) (listing various categorizations of inconsistent verdicts as designated by different courts). Inconsistency in verdicts may stem from errors in fact or in law. The difference matters. *See, e.g., id.* at 383 (Opinion by Watts, J.) ("[F]actually inconsistent verdicts are permissible, while legally inconsistent verdicts are not."); *Commonwealth v. Elliffe*, 714 N.E.2d 835, 838 (Mass. App. Ct. 1999) ("[A] defendant is not entitled to relief where a jury returns factually inconsistent verdicts; problems arise only where verdicts are legally inconsistent—i.e., where, removed from the factual context of the particular case, the government could not possibly have proved the elements of both crimes with respect to the defendant."). In general, we scrutinize questions of law far more closely than questions of fact. The most obvious example for this distinction is our standards of review for questions of fact and questions of law. We review the former for clear error, and the latter for correctness—a much stricter review. *See, e.g., Taylor v. Univ. of Utah*, 2020 UT 21, ¶ 13, 466 P.3d 124. The same distinction should apply when we review errors in verdicts.

¶38 *State v. Stewart*, our only precedent about inconsistent verdicts, dealt with a factual inconsistency—namely an acquittal of some defendants, but not all, for the same crime. 729 P.2d 610 (Utah 1986) (per curiam). It held that the inconsistent factual verdicts could stand. But, as we and the dissent agree,[16] *infra* ¶ 65, its holding and its reliance on *Dunn* and *Powell* do not control our decision today.[17]

---

[16] Despite its agreement with us that *Stewart* does not control this case, the dissent "find[s] the reasoning of *Stewart* to offer persuasive insight that we should not easily dismiss," *infra* ¶ 65. We respectfully disagree with this point. As we explain below, *Stewart* did nothing more than quote and cite cursorily to *Powell* and *Dunn* in a context wholly distinct from ours, *see infra* ¶¶ 39–40. We detailed in length our rejection of *Powell* and *Dunn* above, *supra* ¶¶ 31–34, and *Stewart*'s adoption of these cases in another context has no significance or insight here.

[17] Neither party seems to think that *Stewart* is relevant to this case. The parties have not briefed it at all (except for a footnote citation reference Terry makes in his opening brief) and only addressed *Stewart* at oral argument. The parties instead discussed case law from our court of appeals that adopted *Stewart* or *Powell*. *See, e.g., State v.*

(continued . . .)

¶39 In *Stewart*, four inmates were charged with second-degree homicide for the death of another inmate. Two inmates were acquitted, and the other two—the appellants—were found guilty. 729 P.2d at 611. The appellants claimed that because the evidence about all four charged inmates was the same, they should have been acquitted too. *Id.* In a per curiam decision, this court rejected that argument based on the different evidence that connected the appellants to the murder, compared to the acquitted defendants. In fact, this court rejected the argument that the verdicts were "so obviously inconsistent." *Id.* This court's treatment of *Dunn* and *Powell* was cursory. *See id.* at 611 n.1 (citing *Powell* for the proposition that "[t]he inquiry then is whether the verdicts against [the appellants] are supported by substantial evidence"); *id.* at 612 (quoting *Dunn*'s language about the reasons for a jury's verdict to support the proposition that "[t]he acquittal of [other defendants] does not necessarily require appellants' acquittal").

¶40 A procedural lapse on this court's part—issuing a decision before one of the appellants filed his reply brief—led to a rehearing,

---

*Gibson*, 2016 UT App 15, 366 P.3d 876; *State v. LoPrinzi*, 2014 UT App 256, 338 P.3d 253; *State v. Sjoberg*, 2005 UT App 81U; *State v. Hancock*, 874 P.2d 132 (Utah Ct. App. 1994), *superseded on other grounds by statute*, UTAH CODE § 77-32-304.5 (1997) (repealed), *as recognized in State v. Carreno*, 2006 UT 59, ¶ 16, 144 P.3d 1152. A database research yielded several more court of appeals cases of this progeny that the parties have not discussed. *See, e.g.*, *State v. Atencio*, 2005 UT App 417U (per curiam); *State v. Olive*, 2005 UT App 120U.

None of these court of appeals cases are relevant here. Like *Stewart*, all but two of these cases address claims for factual inconsistency and do not inform our understanding of legally impossible verdicts in which a defendant is acquitted on the predicate offense but convicted on the compound offense. Although two court of appeals cases do discuss alleged legally impossible verdicts (*Hancock* and *Atencio*), and cite *Stewart* in doing so, they both ultimately held that the verdicts examined were not legally impossible verdict. *Hancock*, 874 P.2d at 134; *Atencio*, 2005 UT App 417U, para. 5. Therefore, any reliance on *Stewart* in those cases is not relevant to our discussion here. In this context we also find telling that our court of appeals certified the case to us by the "vote of four judges of the court," noting that it "presents an important first impression question."

which we also decided per curiam. We explained that the appellant simply "reiterate[d] the same arguments as in his original brief on appeal, which arguments were disposed of in our prior decision" and affirmed the conviction. *Id.* at 613. Then we quoted *Powell* for the proposition that "the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts" is sufficient "protection against jury irrationality," *id.* (quoting *Powell*, 469 U.S. at 67), and stated (acknowledging that *Powell* treated a different problem) that "[w]e believe that this same reasoning equally applies in this case when the sufficiency of evidence against different defendants is questioned." *Stewart*, 729 P.2d at 613. We also cited to *Dunn* (among other cases) for the proposition that "it is generally accepted that the inconsistency of verdicts is not, by itself, sufficient ground to set the verdicts aside," *id.*, and again for the proposition that a "jury's acquittal of a defendant, whether tried separately or jointly with others, may also result from some compromise, mistake, or lenity on the jury's part." *Id.* at 614.

¶41 Applying our principles of *stare decisis*, we hold that *Stewart* does not control this case. *Stare decisis* is "a cornerstone of Anglo–American jurisprudence that is crucial to the predictability of the law and the fairness of adjudication." *State v. Thurman*, 846 P.2d 1256, 1269 (Utah 1993). It requires us to "extend a precedent to the conclusion mandated by its rationale." Richard L. Hasen, *Anticipatory Overrulings, Invitations, Time Bombs, and Inadvertence: How Supreme Court Justices Move the Law*, 61 EMORY L.J. 779, 780 (2012) (quoting Barry Friedman, *The Wages of Stealth Overruling (with Particular Attention to* Miranda v. Arizona), 99 GEO. L.J. 1, 12 (2010)). But the "doctrine of stare decisis . . . is neither mechanical nor rigid as it relates to courts of last resort." *State v. Guard*, 2015 UT 96, ¶ 33, 371 P.3d 1 (citation omitted).

¶42 With these principles in mind, our respect for precedent means we value and implement the *text* of our past opinions as far as it can logically go. The question here is whether the rationale behind the "inconsistent verdicts" terminology in *Stewart* encompasses the jury verdict here—namely, legally impossible verdicts in which a defendant is acquitted of the predicate offense but convicted of the compound offense—and therefore controls the question of their validity. We hold that *Stewart* does not control and should be viewed as binding us only as to the fate of factually inconsistent verdicts. *Stewart* recognized that it borrowed from *Powell*—a case that dealt with a different issue. 729 P.2d at 613 ("We believe that this same reasoning equally applies in this case when the sufficiency of evidence against different defendants is questioned."). Our *Stewart*

opinion, therefore, cannot be construed to mean that it decided an issue that even it recognized was not at play in that case.

¶43 Our allegiance to the text also compels us to refuse to creatively read that text. *See, e.g.*, *State v. Argueta*, 2020 UT 41, ¶ 54 n.12, 469 P.3d 938 (explaining that we cannot subscribe to the concurrence's view that our past opinion was a "square holding" in the case before us because the key words in this debate, "'supplemental,' 'different,' or 'reconcilable' do not appear in [the past opinion] in any form"); *Ipsen v. Diamond Tree Experts, Inc.*, 2020 UT 30, ¶¶ 14–15, 466 P.3d 190 (rejecting the idea that negligence could be read to include gross negligence given the material legal differences between the two standards in the context of our case law).

¶44 The alleged connection between *Stewart* and this case resembles our recent discussions in other opinions. *See Argueta*, 2020 UT 41, ¶¶ 50–54 (analyzing and refusing to apply as precedent *State v. Velarde*, 675 P.2d 1194 (Utah 1984)); *Ipsen*, 2020 UT 30, ¶¶ 1–2, 12–13 (holding that a previous case, *Fordham v. Oldroyd*, 2007 UT 74, 171 P.3d 411, which held that "a person does not owe a duty of care to a professional rescuer for injury that was sustained by the very *negligence* that occasioned the rescuer's presence," did not apply to injuries caused by gross negligence or intentional torts). As we were in *Argueta*, here we are confronted with the breadth of the term "inconsistent." And we refuse to engage with this term inconsistently. In *Argueta*, we held that we could not extend the term beyond what it meant in *Velarde*. In *Velarde*, the term "inconsistent" was used by this court to describe a defendant that presented two contradictory versions to what happened in that case. *Argueta*, 2020 UT 41, ¶ 51; *Velarde*, 675 P.2d at 1195. In *Argueta*, we refused to apply that language when the versions that the defendant told were "reconcilable." *Argueta*, 2020 UT 41, ¶ 53. Similarly, in *Ipsen* we refused to extend an exception that we created in *Fordham* for when one owes a duty in negligence cases beyond its original scope. That was because the "concerns" that required the exception in ordinary negligence cases did "not apply when it [came] to gross negligence and intentional torts." *Ipsen*, 2020 UT 30, ¶ 13. We accordingly rejected the dissent's idea there that our use of the term "negligence," "sweep[s] more broadly—in a manner that covers … gross negligence." *Id.* ¶ 33 (Lee, A.C.J., dissenting). *See also McNeal*, 44 A.3d at 992 (holding that a decision that discussed "inconsistent verdicts"—*Price*, 949 A.2d at 622—did not apply to factually inconsistent verdicts because its rationale extended only to legally inconsistent verdicts).

¶45 In *Argueta* and *Ipsen*, we examined whether our past precedents could be logically applied to the circumstances before us, given their *rationale*. Although it may seem that our refusal to apply the past precedents turned on the facts of those past precedents, that was not the case, and, under principles of *stare decisis*, we reject such a fact-based basis for not applying past precedents. *See, e.g., Neese v. Utah Bd. of Pardons and Parole*, 2017 UT 89, ¶ 58, 416 P.3d 663 ("In short, respect for stare decisis requires us to 'extend a precedent to the conclusion mandated by its rationale.'" (citation omitted)). We continue applying this approach consistently here. *Stewart*, like *Velarde* and *Fordham* used a general "umbrella" term that could linguistically encompass the situation before us. But whether we apply past opinions turns on the rationale of those opinions—not merely on their use of less-than-clear terms. And so, our use of the general term "inconsistent verdicts" in *Stewart*, and our unfortunate use of case law about *legally impossible* verdicts in a case about a *factually inconsistent* verdict should not be weaponized to thwart the simple truth: *Stewart* said nothing about our treatment of legally impossible verdicts.

¶46 To summarize, our case law about factually inconsistent verdicts says nothing about legally impossible verdicts and is thus beside the point.

## II. THE REMEDY: USING OUR SUPERVISORY AUTHORITY TO VACATE LEGALLY IMPOSSIBLE VERDICTS

¶47 Holding that legally impossible verdicts cannot stand, we turn now to how we implement our holding. We do so through our constitutionally granted supervisory authority. We first explain that there is currently no procedure that allows a court to vacate a legally impossible verdict. We next explain our prerogative to use our supervisory authority and why it is prudent to do so in this case. Finally, we set out a rule that requires the vacatur of legally impossible verdicts like Terry's.

¶48 There is currently no procedural rule that specifically allows a trial or an appellate court to vacate a verdict because it is legally impossible. True, Utah Rule of Criminal Procedure 23 allows a trial court to "arrest judgment" for "good cause." This rule could arguably be used to vacate legally impossible verdicts. But there's one problem with that logic. The invalidity of legally impossible verdicts in which a defendant is acquitted on the predicate offense but convicted on the compound offense is based on them being erroneous as a matter of law. In contrast, our cases on rule 23 motions to arrest judgment have repeatedly held that a "court may only

reverse a jury verdict when 'the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted.'" *State v. Robbins*, 2009 UT 23, ¶ 14, 210 P.3d 388 (quoting *State v. Bluff*, 2002 UT 66, ¶ 63, 52 P.3d 1210). This dissonance means that rule 23 is not an adequate route for the invalidation of legally impossible verdicts in which a defendant is acquitted on the predicate offense but convicted on the compound offense.

¶49 Because of the lack of any existing procedural avenue, we turn to our constitutionally sanctioned supervisory authority over criminal and civil trials. *See* UTAH. CONST. art. VIII, § 4 ("The Supreme Court shall adopt rules of procedure and evidence to be used in the courts of the state and shall by rule manage the appellate process."); *State v. Thurman*, 846 P.2d 1256, 1266 (Utah 1993) ("In Utah, the supreme court has [an] . . . inherent supervisory authority over all courts of this state.").

¶50 We can use our constitutionally granted supervisory authority through our appellate procedure. We have done so many times, with the purpose of "get[ting] the law right." *McDonald v. Fid. & Deposit Co. of Md.*, 2020 UT 11, ¶ 33, 462 P.3d 343. After all, "[i]t is our *province* and *duty* to say what the law is." *Id.* (emphasis added); *see also, e.g.*, *State v. Argueta*, 2020 UT 41, ¶¶ 33–34, 469 P.3d 938 (clarifying our doctrine-of-chances analysis although we "recently charged our advisory committee on the Utah Rules of Evidence to propose recommendations to address this issue" because it was necessary in that case and because it is our role to "clarify[] the doctrine's application in our case law, as relevant issues come up"); *State v. Guard*, 2015 UT 96, ¶¶ 1, 4, 371 P.3d 1 (describing the change that we announced regarding the reliability of eyewitness expert testimony (moving from a "de facto presumption against their admission" to holding them "reliable and helpful") in *State v. Clopten*, 2009 UT 84, ¶¶ 30, 49, 223 P.3d 1103, as a "new rule[] of criminal procedure announced in [a] judicial opinion[]"); *Manning v. State*, 2005 UT 61, ¶¶ 29, 31, 122 P.3d 628 (formulating a rule—which later became rule 4(f) of the Utah Rules of Appellate Procedure—that allowed defendants to file motions to "reinstate the time frame for filing a direct appeal"); *State v. Brown*, 853 P.2d 851, 856–57 (Utah 1992) (holding that "as a matter of public policy and pursuant to our inherent supervisory power over the courts, as well as our express power to govern the practice of law, counsel with concurrent prosecutorial obligations may not be appointed to defend indigent persons," and as a result "revers[ing] [the] conviction and order[ing]

a new trial"); *State v. James*, 767 P.2d 549, 557 (Utah 1989) (invoking this court's "inherent supervisory power over trial courts" to order the bifurcation of hearings when evidence of prior convictions is introduced at first-degree murder trials and to remand the case to "proceed in accordance with" that holding); *see also State v. Bennett*, 2000 UT 34, ¶ 13, 999 P.2d 1 (Durham, A.C.J., concurring in the result) (listing cases recognizing and applying our "supervisory power" on appeal to articulate new criminal procedural rules).

¶51 It is true that, at times, referring the drafting of rules to our advisory committees is the prudent path to take in rulemaking. *See Cougar Canyon Loan, LLC v. Cypress Fund, LLC*, 2020 UT 28, ¶ 15, 466 P.3d 171. But it is not a mandatory path. *Compare State v. Perea*, 2013 UT 68, ¶¶ 137–38, 322 P.3d 624 (Lee, J., concurring) (advocating against this court's rulemaking during an appellate case), *with Manning*, 2005 UT 61, ¶ 31 (unanimously doing exactly what Justice Lee argued in *Perea* that we should not). And our abundant case law proves clearly that exercising our supervisory authority in the appellate process is well within our wheelhouse. *See supra* ¶ 50; *see also In re K.T.B.*, 2020 UT 51, ¶ 115 n.200 (Petersen, J., concurring in the result); *id.* ¶ 123 n.201 (Lee, A.C.J., dissenting) (recognizing that "[t]his court may well have the authority to prescribe a procedural default rule that could govern in a case like this one" without any need to refer the matter to our advisory rule committee).

¶52 But exercising our supervisory authority on appeal is "especially appropriate" when we "require certain procedures" to protect "fundamental values" which would be "threatened by other modes of proceeding." *State v. Bishop*, 753 P.2d 439, 499 (Utah 1988) (Zimmerman, J., concurring in the result), *overruled in part on other grounds by State v. Menzies*, 889 P.2d 393, 398 (Utah 1994); *see also James*, 767 P.2d at 557 (quoting Justice Zimmerman's concurrence in *Bishop*). Here, the use of our supervisory authority is needed to prevent a legally impossible verdict—an outcome "truly repugnant" to the fundamental values of our judicial system. *People v. Bullis*, 30 A.D.2d 470, 472 (N.Y. App. Div. 1968). This case neatly fits the *Bishop* articulation. What is more, we are having this conversation against the backdrop of a live controversy, in a criminal matter in which a defendant's interests are directly implicated. And "new rules of criminal procedure announced in judicial decisions apply retroactively to all cases pending on direct review," *Guard*, 2015 UT 96, ¶ 61, including the case in which the court announces them. *See, e.g., Clopten*, 2009 UT 84, ¶¶ 30, 49 (reversing a "de facto presumption against the admission of eyewitness expert testimony" because such testimony is "reliable and helpful" and "vacat[ing] [the defendant's]

conviction and remand[ing] for a new trial in accordance with our decision"); *Manning*, 2005 UT 61, ¶ 32 (implementing a procedural rule that this court announced in that case). In this posture, a reference to our advisory committee in this case is akin to "a shrug of the judicial shoulders," *State v. Halstead*, 791 N.W.2d 805, 815 (Iowa 2010), and would be unconscionable.

¶53 We accordingly hold today that upon an allegation of a legally impossible verdict by a jury, in which a defendant is acquitted on the predicate offense but convicted on the compound offense, the reviewing court (whether it be the trial court or on appeal) should look into the elements of the crime, the jury verdicts, and the case's instructions. *See id.*; *People v. Tucker*, 431 N.E.2d 617, 619–21 (N.Y. 1981). And if the court finds that the conviction of the compound offense is impossible in the face of an acquittal of a predicate offense, then the verdict is legally impossible and should be overturned, because "without the underlying [offense] the [compound] charge [cannot] stand." *Eaton v. State*, 438 So. 2d 822, 823 (Fla. 1983); *see also, e.g.*, *Cochran v. State*, 220 S.E.2d 477, 478 (Ga. Ct. App. 1975) (holding that because "the elements of the offenses of aggravated assault and criminal damage to property are different, a finding of not guilty as to one and guilty as to the other is neither inconsistent nor repugnant"); *Halstead*, 791 N.W.2d at 816 (reversing a conviction of a compound offense because the "jury simply could not convict [the defendant] of the compound crime of assault while participating in a felony without finding him also guilty of the predicate felony offense of theft in the first degree" (footnote omitted)); *People v. Delee*, 108 A.D.3d 1145, 1148 (N.Y. App. Div. 2013) ("[B]ased on our review of the elements of the offenses as charged to the jury, we conclude that the verdict is inconsistent, i.e., 'legally impossible.'").

¶54 Our decision today is a policy pronouncement of a narrow scope. It is limited to legally impossible verdicts in which a defendant is acquitted on the predicate offense but convicted on the compound offense. We also strongly believe that our ruling will assist in eliminating further mischief of this type. Our newly established rule will likely incentivize judges and prosecutors to use more precise jury instructions and to employ special verdict forms to help avoid the possibility of such legally impossible verdicts.

¶55 We also, however, task our advisory committee to establish a rule that reflects our decision today. We have done this before. *See Manning*, 2005 UT 61, ¶ 31 (After our decision in *Manning*, which established a new rule that allows defendants to move to reinstate their right to appeal, our advisory committee formulated a rule—rule 4(f) of the Utah Rules of Appellate Procedure—reflecting our

¶56 appellate-driven rulemaking. *See* UTAH R. APP. P. 4(f) advisory committee's note ("Paragraph [4](f) was adopted to implement the holding and procedure outlined in *Manning v. State*.")); s*ee also* UTAH R. CIV. P. 7 advisory committee's note (explaining that a "major objective of the 2015 amendments [was] to continue the policy of clear expectations of the parties established in" a line of this court's cases). In this vein, we recognize that our reasoning today may extend to some other types of inconsistent verdicts—not covered by this case or *Stewart*. If it truly is the case that persuasive arguments can be made against other forms of inconsistent verdicts, we should not be opposed to hearing them. Our advisory committee should therefore consider other forms of inconsistencies in its deliberations. In any case, our self-imposed procedure—unlike a constitutional or statutory limit—should not prevent us from delivering justice today.

## CONCLUSION

¶57 A jury simply could not both convict Terry of the compound offense of domestic violence in the presence of a child and acquit him of the predicate offense of domestic violence assault. Such a verdict cannot stand as a matter of law. We use our constitutionally granted supervisory authority to establish a rule by which such verdicts must be overturned, and we refer the issue of inconsistent verdicts to our advisory committee for consideration in accordance with this opinion. Given this resolution, we reverse and vacate Terry's conviction of the compound offense.

———————————

JUSTICE PETERSEN, dissenting:

¶58 The majority holds that Utah courts must overturn a conviction if the jury's verdict is "legally impossible," meaning that the jury acquitted the defendant of a predicate offense but convicted on a related compound offense. As an appellate court, we must ensure that a trial court's jury instructions and rulings were not infected with legal error when a defendant raises such a challenge. Likewise, when the issue is raised, we must ensure that a conviction was supported by sufficient evidence. We make these assessments on each challenged count independently. But the majority's holding requires Utah courts to conduct a novel kind of review—assessing the validity of one count based on the jury's verdict on another count. Deriving meaning from an internal contradiction in a jury verdict is guesswork. To open the door to this practice is to replace the jury's collective judgment with a speculative judicial presumption and diminish the finality of jury verdicts. We should resist this temptation

and continue to review challenged counts independently based upon the trial record.

¶59 I agree that the verdict here is confounding. We have no idea why the jury found beyond a reasonable doubt that Terry committed domestic violence in front of his child but acquitted him of domestic violence based on the same facts. What we do know is that Terry does not challenge the relevant jury instructions or complain of any other legal error at trial. And we know that Terry does not dispute that Pleasant Grove put on sufficient evidence in support of the conviction. Accordingly, viewed independently, Terry's conviction is undisputedly valid. But Terry argues, and the majority agrees, that his conviction for committing domestic violence in front of a child should be overturned because it is in legal conflict with the jury's acquittal on a separate count of domestic violence.

¶60 Importantly, neither the United States Constitution, the Utah Constitution, nor the Utah Code have been read to require that an inconsistent but otherwise valid conviction be overturned. *See, e.g.,* *United States v. Powell*, 469 U.S. 57, 65 (1984) ("Inconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course. . . . [N]othing in the Constitution would require such a protection, and we therefore address the problem only under our supervisory powers over the federal criminal process."). The majority acknowledges this but determines that we should prohibit a "legally impossible" verdict pursuant to our power to supervise the courts.

¶61 The United States Supreme Court has rejected such an approach because it is based on speculation and departs from the foundational principle that courts should review each count of conviction independently. In *Dunn v. United States*, the defendant was convicted of "maintaining a common nuisance by keeping for sale at a specified place intoxicating liquor," but was acquitted of possessing or selling such liquor. 284 U.S. 390, 391–92 (1932). In affirming the conviction, the Court explained, "Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." *Id.* at 393. And the Court reasoned, "The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *Id.* (citation omitted).

¶62 The Court reaffirmed this holding in *Powell*, in which the defendant was convicted of using the telephone to commit, cause, and facilitate a conspiracy to possess with intent to distribute cocaine, but was acquitted of conspiring to possess with intent to distribute such cocaine. 469 U.S. at 59–60. In *Powell*, the Court rejected the argument that the majority embraces today:

> [T]he argument necessarily assumes that the acquittal on the predicate offense was proper—the one the jury "really meant." This, of course, is not necessarily correct; all we know is that the verdicts are inconsistent. The Government could just as easily—and erroneously—argue that since the jury convicted on the compound offense the evidence on the predicate offense must have been sufficient.

*Id.* at 68. The Court stated emphatically that "[t]he rule established in *Dunn v. United States* has stood without exception in this Court for 53 years. If it is to remain that way, and we think it should, the judgment of the Court of Appeals must be *[r]eversed*." *Id.* at 69. The rule has now stood for eighty-eight years.

¶63 We have adopted the Supreme Court's reasoning in the context of factually inconsistent verdicts. *See State v. Stewart*, 729 P.2d 610, 612-14 (Utah 1986) (per curiam). In *Stewart*, four co-defendants were tried for the stabbing death of a fellow prison inmate based on similar evidence, but two were convicted and two were acquitted. *Id.* at 611. The two convicted defendants appealed, arguing that the verdicts were so "obviously inconsistent that they demonstrate an insufficiency of the evidence." *Id.*

¶64 We rejected that argument. *Id.* In doing so, we employed the rationale of *Dunn* and *Powell*. We determined that the evidence in support of the convictions was sufficient and observed that our review of one count of conviction "should be independent of the jury's determination that evidence on another count was insufficient." *Id.* at 613 (quoting *Powell*, 469 U.S. at 67). Further, we explained that once the prosecution has "convince[d] the jury with its proof, and . . . satisf[ied] the courts that given this proof the jury could rationally have reached a verdict of guilt beyond a reasonable doubt[,] [w]e do not believe that further safeguards against jury irrationality are necessary," *id.* (quoting *Powell*, 469 U.S. at 67).

¶65 And we rejected the premise that we should accept the jury's acquittals over its guilty verdicts. We stated:

> Appellant argues that because the evidence must have been insufficient as to the acquitted defendants, it was

just as insufficient as to the convicted defendants. Therefore, appellant concludes, the jury's verdict as to all the defendants must really be interpreted as an acquittal. However, the prosecution could just as logically and erroneously reason that because the evidence is "in effect the same," the guilty verdicts indicate the jury's true intentions and the verdicts of acquittal should be reversed.

*Id.* at 613 n.1 (quoting *Powell*, 469 U.S. at 68).

¶66 I agree with the majority that our decision in *Stewart* does not control our decision today. A legally contradictory verdict may present us with different considerations than a factually inconsistent verdict, and it is fair to analyze whether the rationale of *Stewart* should extend to the facts here. But I find the reasoning of *Stewart* to offer persuasive insight that we should not easily dismiss.

¶67 Specifically, there is a sound basis for our practice of reviewing each challenged count of conviction independently. It properly confines us to the trial record. And it prevents us from basing legal conclusions on speculative presumptions about the jury's intentions. As the Tenth Circuit has explained, "We cannot properly draw from the acquittal on Count II any inference regarding the basis of the jury's conviction on Count I." *United States v. Espinoza*, 338 F.3d 1140, 1148 (10th Cir. 2003).

¶68 We simply do not know which side was harmed in the event of an inconsistent verdict because we do not know why the jury made the decisions it did. Such verdicts "should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense." [18] *Powell*, 469 U.S. at 65.

---

[18] The *Powell* Court discussed further the possibility that inconsistent verdicts may generally favor criminal defendants, observing "*Dunn's* alternative rationale" that "such inconsistencies often are a product of jury lenity." *United States v. Powell*, 469 U.S. 57, 65 (1984). The Court noted that "*Dunn* has been explained by both courts and commentators as a recognition of the jury's historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the Executive Branch." *Id.* (citations omitted).

(continued . . .)

¶69 Although we can only guess why the jury here returned the verdicts it did, the majority's solution is to effectively presume that the jury "really meant" the acquittal and to therefore overturn the conviction. The majority concludes this is preferable because it furthers the principle that "[i]t is better that ten guilty persons escape than one innocent suffer." *Supra* ¶ 25 (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *352). The majority argues that to let the conviction stand is to presume "unlawful acquittal," *supra* ¶ 25, and that the jury "'engage[s] in an act of lenity when it acquit[s] the defendant' of a predicate offense but convicts the defendant of the compound one." *Supra* ¶ 32 (citation omitted).

¶70 But that is not so. Analyzing separate counts independently makes no presumption in either direction. It simply allows the jury's verdict to stand on each count as-is, as long as it is otherwise valid. So here, Terry "is given the benefit of [the] acquittal on the counts on which [he] was acquitted," and "accept[s] the burden of conviction on the counts on which the jury convicted." *Powell*, 469 U.S. at 69. In contrast, the majority's approach requires a portion of the jury's verdict to be discarded—replaced by a reviewing court's presumption that the jury's determination of guilt beyond a reasonable doubt on one count is invalid because the jury spoke its true intentions with respect to the count of acquittal.

¶71 And it is important to remember that here, as would be the case with any conviction that is "otherwise valid," there is no legal or evidentiary challenge to the conviction on its own. The "repugnancy" that the majority speaks of is inconsistency itself. But we can only speculate as to what the inconsistency actually means.

¶72 By mandating that such jury verdicts be overturned by reviewing courts, the majority weakens our longstanding and deep reluctance to disturb the finality of a jury verdict. "[O]nce the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment. . . . [T]hrough this deference the jury brings to the criminal process, in addition to the

---

Here, it is possible that the jury felt the City's decision to charge Terry with both domestic violence and domestic violence in the presence of a child was overkill, and therefore chose to convict him of only one. This seems a more likely explanation than animus. *See supra* ¶ 32 n.15. But my primary point is that we simply do not know.

collective judgment of the community, an element of needed finality." *Id.* at 67 (citations omitted).

¶73 The rule the majority announces today is admittedly a narrow one. But the majority also says, "We routinely overturn trial courts' decisions for legal errors. We should do the same when a jury makes a legal error." *Supra* ¶ 27. And it invites our advisory committee to "consider other forms of inconsistencies in its deliberations." *Supra* ¶ 55. This foreshadows a willingness to expand the practice of appellate courts (or trial courts faced with a motion for a new trial) comparing counts against one another and applying groundless presumptions about what the jury must have meant. The potential for this is high, as verdicts can be legally and factually inconsistent in various ways and to different degrees.

¶74 For example, in his dissent in *Dunn*, Justice Butler criticized the "repugnancy" of all manner of inconsistent verdicts. 284 U.S. at 399–407 (Butler, J., dissenting). He argued that "[i]n criminal cases no form of verdict will be good which creates a repugnancy or absurdity in the conviction." *Id.* at 400. He explained that for an offense requiring the participation of two or more, if one person were convicted and the others acquitted, the verdict would be "deemed wholly repugnant and invalid." *Id.* at 402 (citation omitted). In another example he argued, "On indictment of riot against three," a verdict finding less than three defendants guilty is void, "for more than two must riot." *Id.*

¶75 But if we set out to correct inconsistencies by comparing separate counts and making a presumption about "Count II" based on the jury's decision on "Count I," we replace the jury's collective judgment with judicial speculation. The majority disagrees, asserting that no speculation or inquiry into the jury's deliberations is required because a reviewing court will be able to spot a legal impossibility on the face of the verdict. *Supra* ¶ 33. But this does not resolve my critique. While the reviewing court may not be piercing jury deliberations to find the jury's true intent, it goes a step further and presumes it knows the answer.

¶76 We should not draw from a jury's decision to acquit on one count an inference regarding its decision to convict on a separate count. Assessing Terry's conviction for domestic violence in the presence of a child independently, there is no dispute that it is valid. I would affirm.